UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

E. RONALD MILAN and
ESTELLE MILAN,

        Plaintiffs,                Civil Case No. 14-10255
                                    Honorable Linda V. Parker

v.

PACIFIC INDEMNITY COMPANY,

        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In this diversity action removed from the Circuit Court for Oakland County, Michigan, Plaintiffs seek benefits under an "excess" insurance policy issued by Defendant Pacific Indemnity Company allegedly due as a result of an automobile accident in which Plaintiff E. Ronald Milan was injured. Presently before the Court is Defendant's motion for partial summary judgment, filed pursuant to Federal Rule of Civil Procedure 56 on November 14, 2014. (ECF No. 31.) The motion has been fully briefed (ECF Nos. 33, 34); and on February 11, 2015, this Court held a hearing with respect to the motion. At the end of the hearing, Plaintiffs' counsel asked the Court for the opportunity to submit additional documentation in support of Plaintiffs' claim. The Court granted the request and Plaintiffs submitted supplemental exhibits on February 23, 2015. (ECF No. 37.)

Defendant filed a supplemental brief addressing those exhibits on March 2, 2015.

(ECF No. 38.)  The Court is now prepared to issue a decision.

## I.      Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is

appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a). The central inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56

mandates summary judgment against a party who fails to establish the existence of

an element essential to that party's case and on which that party bears the burden

of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine

issue of material fact."  *Id*. at 323. Once the movant meets this burden, the

"nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To

demonstrate a genuine issue, the nonmoving party must present sufficient evidence

2

upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Factual and Procedural Background

On August 26, 2010, Plaintiff E. Ronald Milan ("Mr. Milan") was injured when his vehicle was rear ended by another vehicle which was traveling at a high rate of speed.[1]  At the time, Mr. Milan was 78 years old.  Prior to the date of the accident, Mr. Milan purchased an underinsured motorist insurance coverage policy from Defendant Pacific Indemnity Company (hereafter "Pacific Indemnity").[2]  The policy provides that in the event of a claim for underinsurance motorist coverage,

---

[1] Defendant states in its brief that the accident occurred on October 26, 2010 (*see* ECF No. 31 at Pg ID 254); however, this is obviously a typographical error as the testimony cited to support this factual assertion indicates that the accident occurred on August 26, 2010.  (*Id.*, Ex. A at 4.)  The police report from the accident also reflects the August 26, 2010 date.  (ECF No. 33, Ex. 1.)
[2] The insurance policy has not been placed in the record in this case.

Pacific Indemnity will pay excess benefits to Mr. Milan up to the sum of one

million dollars once his claim reaches a threshold of $250,000.  Plaintiffs filed this

lawsuit to recover, inter alia, "loss of future earnings" related to a multi-unit

apartment complex development project in Dallas, Texas, initially called Nueva

Vista and subsequently renamed Solaris (hereafter the "Solaris project").[3]  (Compl.

¶ 17.)

For the past thirty-five years or more, Mr. Milan has been involved in

approximately thirty commercial real estate development projects, in addition to

working as a personal injury and real estate lawyer.  For the majority of these

projects, Mr. Milan was the developer, building the project from the ground up

(e.g. obtaining site plan approval, the drawings, and engineering plans) or

"gentrifying" existing property.  (ECF No. 31, Ex. A at 47, 52, 65, 72.)  Mr. Milan

was a partner with Martin Nessel in several limited liability companies that owned

real estate development projects.  (ECF No. 31, Ex. 6 at 21.)

In February or March 2010, Martin Nessel's son, Ariel Nessel ("Ari"),

presented the Solaris project to Mr. Milan.  (ECF No. 31, Ex. 5 ¶ 7.)  Mr. Milan

asserts in an affidavit submitted in response to Pacific Indemnity's motion that Ari

---

[3] Related to the August 26, 2010 accident, Mr. Milan filed three additional lawsuits.
He sued AAA for first-party no-fault benefits and underinsured benefits and the
driver of the vehicle that hit him for third party benefits.  (ECF No. 31, Ex. 1 at 7,
10.)  The lawsuits against AAA were settled for $10,000 and $80,000, respectively.
(*Id.*)  The action against the driver was settled for $20,000.  (*Id.* at 10.)

was interested in his opinion and analysis of whether the project was viable and if

Mr. Milan "would take this project on." (*Id*.) The project involved scheduled

improvements of $5,000 per unit to the apartment complex's over 400 units. (*Id*.,

Ex. 3 at 48.) Ari had been involved in real estate for more than ten years at that

time, doing construction management for other developers and then on his own

projects. (*Id*., Ex. 7 at 5-6.) Martin Nessel also was going to be involved in the

Solaris project.

At some point in 2010, Mr. Milan informed Martin Nessel and Ari that the

Solaris project "would be a good project to add to [his] portfolio." (ECF No. 31,

Ex. 5 ¶ 9.) Mr. Milan had not yet visited the project site by this point in time and

Martin Nessel testified during his deposition that, to his knowledge, Mr. Milan has

never been there. (*Id*., Ex. 6 at 30; *see also* ECF No. 37, Ex. 13.) Martin Nessel

did travel to Dallas from Michigan to see what Ari was proposing to buy and

conveyed to Mr. Milan his view that it was a worthwhile investment. (ECF No.

31, Ex. 6 at 26-27.) Mr. Milan claims that they "then turned to the financing part

of the project as well as the remodeling that would have to be done to modernize

the project, rental rates, leasing, and positioning." (*Id*.)

According to Mr. Milan, in November 2010, he met with Ari and Martin

Nessel at the latter's house in Michigan, at which time a Memorandum of

Agreement was prepared. (ECF No. 31, Ex. 3 at 50; Ex. 4.) The document reflects

5

the following: Mr. Milan and Martin Nessel would each acquire a fifty percent (50%) interest in the Solaris project as tenants-in-common; Ari would asset manage the project and contract for an improvement program; Mr. Milan and Martin Nessel would provide all the funds for the undertaking equally in exchange for a twelve percent (12%) preferred return on their invested capital; Ari would receive a one percent (1%) asset management fee and a fourteen percent (14%) fee for the contracted improvements; and management of the project would be provided by third parties at 3.5% plus a bonus. (*Id.*, Ex. 4.) Mr. Milan and Martin Nessel were each expected to invest one million dollars initially and had the money ready to commit to the project. (*Id.*, Ex. 3 at 53; Ex. 5 ¶ 13.) The Memorandum of Agreement was never executed. (*Id.*, Ex. 3 at 50.)

Mr. Milan attests that, although not part of the written agreement, he, Martin Nessel, and Ari also agreed that Mr. Milan would, "as [he] had done in the past[,] supervise the execution of the rehab of the project that would require [his] physical presence for periods of time in Dallas." (*Id.*, Ex. 5 ¶ 12.) Mr. Milan contends that this was not included in the written agreement because

> the only person that it pertained to was Martin Nessel and he was fully familiar with [Mr. Milan's] method of operation and the requirement that [he] personally supervise as [Martin Nessel] had invested in a few properties prior to that date and had agreed that this method which had demonstrated to be successful would be applied to this project.

(*Id.*)  During his deposition, Mr. Milan testified that he did not trust "Mr. [Martin] Nessel or Ari with five thousand dollars gentrification per unit if [he] couldn't get down there to see what was getting done."  (*Id.*, Ex. 3 at 52.)

When he was deposed during this litigation, Ari had no recollection of discussing the deal with Mr. Milan in November 2010, or the specifics of the terms discussed relative to Mr. Milan's investment.  (*Id.*, Ex. 7 at 13-15.)  Ari indicated that it was uncommon for him to put no money in on a deal, as suggested in the Memorandum of Agreement presented by Mr. Milan; however the remaining terms were consistent with the terms Ari offered investors in his other projects.  (*Id.* at 15-17.)  Ari also provided that he has a construction management company that performs the improvements on his properties and the repositioning of his assets.  (*Id.* at 17-18.)  When asked if Mr. Milan was ever going to do this part of the deal, Ari indicated that "[e]verything is always open for negotiation for investment.  If there's someone who brings some great knowledge and experience, I'm open to them participating in that."  (*Id.* at 18.)  However, Ari did not recall offering Mr. Milan any control over the repositioning, beautification, or gentrification of the Solaris project.  (*Id.* at 20.)

Mr. Milan claims that he was making plans to travel to Texas in December 2010.  (*Id.* at 49.)  He testified that he was not physically able to so do, however, due to the deterioration of his physical condition which resulted from the injuries

7

he suffered in the August 26, 2010 accident. (*Id.*, Ex. 5 ¶ 14.) Because he could not travel to Texas "to do the implementation", Mr. Milan decided not to invest in the project. (*Id.*, Ex. 3 at 51, 53.) He testified that he does not "spend five thousand dollars a unit without being able to supervise it." (*Id.* at 65.) When asked whether Mr. Milan gave him a reason for not investing in the Solaris project, Ari recalled that Mr. Milan "wanted to see the deal because he didn't want to invest in something without having firsthand direct viewing of it, and he was having some problems getting down to view it, the property." (*Id.*, Ex. 7 at 20-21.)

When Mr. Milan decided not to invest in the Solaris project, his share of the initial $2 million investment was picked up by Martin Nessel and his wife (and Ari's mom), Sandra Nessel. (*Id.* at 11-12; Ex. 6 at 16.) Based on the return the Nessels have received on their investment, Mr. Milan claims in this lawsuit that the loss he suffered through 2013 for not participating in the Solaris project was over $3 million. He claims that Pacific Indemnity is obligated to cover this amount as "work loss" under Michigan Compiled Laws Section 500.3107(b).

## III.    Pacific Indemnity's Arguments and Plaintiffs' Response

In its motion for partial summary judgment, Pacific Indemnity argues that Mr. Milan is not entitled to coverage for his claimed loss with respect to the Solaris project because he cannot present evidence to show that his lack of involvement in the project was caused by the injuries he suffered in the 2010 accident. According

8

to Pacific Indemnity, Mr. Milan's claim requires proof of the following: " '(1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages.' "  (ECF No. 31 at Pg ID 261, quoting *Cummins v. Robinson Twp.*, 770 N.W.2d 421, 433 (Mich. App. 2009) (setting forth the elements of a negligence claim).)  Pacific Indemnity states that "[t]he element that is at issue in this motion is causation."  (*Id.*) Referring to the proof of factual causation required in a products liability case, Pacific Indemnity then contends that Mr. Milan lacks evidence from which a jury could conclude "that it is more likely than not" that his failure to get involved in the project resulted from his injuries in the automobile accident.  (ECF No. 31 at Pg ID 261-62, quoting , *Skinner v. Square D*, 516 N.W.2d 475, 480-81 (Mich. 1994).)

Responding to Mr. Milan's claim that he did not get involved in the Solaris project due to his inability to travel to Dallas to supervise the project, Pacific Indemnity asserts that Mr. Milan "was never offered the ability to supervise the project." (ECF No. 31 at Pg ID 264-65.)  Pacific Indemnity continues: "it was [Mr. Milan's] own hubris about him being the only person to make a project successful and unwillingness to let anybody else control the gentrification of a property that caused him to pass on the Solaris project."  (*Id.*)

In response, Plaintiffs contend that there is sufficient evidence to create a genuine issue of material fact with respect to whether the accident-- more

9

specifically, the injuries arising therefrom-- was the cause of Mr. Milan's failure to become involved in the Solaris project. Plaintiffs point to Mr. Milan's deposition testimony and sworn statement that he would get involved in a real estate project only if he had control over the development and that he planned to personally supervise the Solaris project. Plaintiffs note that, when he testified, Ari had a hard time remembering the details of the parties' agreement and did not unequivocally reject Mr. Milan's understanding of what his involvement in the project development would be. Plaintiffs contend that the Michigan Supreme Court's discussion of causation in *Skinner* relating to whether the defendant's negligence was the proximate cause of the plaintiff's injury has nothing to do with the present case.

Plaintiffs spend a considerable portion of their response brief summarizing Michigan court decisions addressing whether a loss constitutes a "work loss" recoverable under Michigan Compiled Laws Section 500.3107, specifically whether the evidence presented establishes a concrete rather than a conjectural loss. (ECF No. 33 at 12-19.) In doing so, Plaintiffs raise an issue that this Court does not understand to be presented in Pacific Indemnity's motion: whether Mr. Milan's asserted loss from the Solaris project constitutes "wage loss" under the statute. In this Court's view, this is the primary issue raised by Plaintiffs' claimed loss arising from the Solaris project.

10

Pacific Indemnity takes up this issue in its reply brief, contending that the evidence only supports a finding that Mr. Milan was an investor with respect to the Solaris project (even if he acted as a real estate developer with respect to other projects) and that lost investment income is not recoverable under Section 500.3107. Although recognizing Plaintiffs' claim that there was an "agreement" for Mr. Milan to be personally involved in the project's development, Pacific Indemnity argues that there was no meeting of the minds to incorporate such a term in the parties' agreement as Ari testified that Mr. Milan was only going to be an investor. Citing *Clute v. General Accident Assurance Company of Canada*, 446 N.W.2d 839 (1989), Pacific Indemnity argues that Mr. Milan's after-the-fact, self-serving statements of his intentions with respect to the project are insufficient to support his claim for work loss benefits.

## IV.    Applicable Law and Analysis

Under Michigan's No-Fault Act, personal protection insurance benefits are payable for "loss of income from work an injured person would have performed during the first 3 years after the date of the accident if he or she had not been injured." Mich. Comp. Laws § 500.3107(b). The Michigan Supreme Court found in *Perez v. State Farm Mutual Automobile Ins. Co.*, 344 N.W.2d 773 (1984), that "the legislative purpose in providing work-loss benefits to an injured person under the no-fault act is to compensate him (and his dependents) by providing protection

11

from economic hardship caused by the loss of the wage earner's income as a result of an automobile accident." *Id*. at 776 (citations omitted).

The insured bears the burden of demonstrating his or her entitlement to work loss benefits. *Sullivan v. North River Ins. Co.*. 606 N.W.2d 383, 385 (Mich. Ct. App. 1999) (citing *Nasser v. Auto Club Ins. Ass'n*, 457 N.W.2d 637, 645 (Mich. 1990)). The claimant's entitlement to benefits depends on "whether the claimant can prove that, but for the accident, [he or] she would have been employed and, as a consequence, would have suffered actual loss of earnings." *Id.* (citing *MacDonald v. State Farm Mut. Ins. Co.*, 350 N.W.2d 233, 235 (Mich. 1984)); *see also Marquis v. Hartford Accident & Indem.*, 513 N.W.2d 799, 803 (Mich. 1994) (quoting *MacDonald*, 350 N.W.2d at 235) ("the *MacDonald* Court found it clear that 'work-loss benefits compensate the injured person for income he would have received but for the accident.' "). Describing the causation required to satisfy the claimant's burden of proof, the Michigan courts have stated:

> [T]here is a "but for" factual issue like proximate causation: if, but for the accident, [the] plaintiff would have been able to work, work-loss benefits are payable. On the other hand, even if no accident had occurred but [the] plaintiff would not have been able to work, no work-loss benefits would be payable.

*Morales v. State Farm Mut. Auto. Ins. Co.*, 761 N.W.2d 454, 465 (Mich. Ct. App. 2008); *see also Nawrocki v. Hawkeye Sec. Ins. Co*, 268 N.W.2d 317, 322 (Mich.

Ct. App. 1978) (explaining that the statute "requires no more than that the work be lost as a direct consequence of the injury.").

Viewing the evidence in a light most favorable to Plaintiffs, as this Court must in deciding Pacific Indemnity's summary judgment motion, the Court finds a genuine issue of material fact with respect to whether Mr. Milan would have become involved in the Solaris project "but for" the injuries he suffered in the August 26, 2010 automobile accident.  The question of whether the agreement between Mr. Milan, Martin Nessel, and Ari contemplated Mr. Milan's involvement in the actual development of the project is not relevant to the causation inquiry. Mr. Milan's testimony at his deposition and statements in his affidavit present evidence to show that he would have become involved in the project but for his inability to travel to Texas and personally view the project site and that he was not able to travel as a result of the injuries suffered in the automobile accident.  When asked if Mr. Milan ever gave him a reason for not investing in the Solaris project, Ari provided similarly:

> My recollection was that he wanted to see the deal because he didn't want to invest in something without having firsthand direct viewing of it, and he was having some problems getting down to view it, the property.
>
> * * *
>
> He gave me reasons why he didn't come visit the property, and I think they were health-related issues. . . .

(ECF No. 31, Ex. 7 at 20-21.)

13

There is no evidence to support Pacific Indemnity's assertion in its reply brief that the "but for" cause of Mr. Milan's failure to invest in the project was his desire to control any project with which he is involved and an unwillingness to let him have that control with respect to the Solaris project. (*See* ECF No. 34 at Pg ID 436.) But even if evidence raised such a suggestion, it would be for the trier of fact to decide whether to accept Mr. Milan's explanation for his decision not to invest or find some other cause for his loss. Mr. Milan's contemplated involvement in the Solaris project is determinative, however, of whether his claimed loss constitutes "work loss" recoverable under Section 500.3107(b).

Neither "work loss" nor "loss of income from work" is defined in Michigan's No-Fault Act. When construing the statute, specifically section 500.3107, the Michigan courts therefore have turned to the Uniform Motor Vehicle Accident Reparations Act ("UMVARA"), on which Michigan's statute is patterned, and the drafter's comments. *Marquis*, 513 N.W.2d at 802 (citing *MacDonald*, 350 N.W.2d at 235). The section of the UMVARA from which section 500.3107 is drawn provides:

> "(ii) 'Work loss' means loss of income from work the injured person would have performed if he had not been injured, and expenses reasonably incurred by him in obtaining services in lieu of those he would have performed for income, reduced by any income from substitute work actually performed by him or by income he would have earned in available appropriate substitute work he was capable of performing but unreasonably failed to undertake."

14

UMVARA § 1(a)(5)(ii) (2005). With respect to "work loss", the commissioners' comments provide in part: "Work loss includes not only lost wages, but lost profit which is attributable to personal effort in self-employment (*as distinguished from profit attributable to investment*) . . . ." *Id.*, comments (emphasis added).

In *Coates v. Michigan Mutual Insurance Co.,* 306 N.W.2d 484 (Mich. Ct. App. 1981), the court found the above-quoted material from the uniform act supportive of its conclusion that "[t]he language of [section] 3107(b) would appear to preclude benefits for the loss of income consisting of return on the investment of capital, as opposed to income generated from a person's endeavors, skill, and attention." *Id.* at 485 (citing *Zyck v. Hartford Ins. Grp*., 364 A.2d 32 (N.J. Super. Ct. 1976), *aff'd in part and rev'd in part*, 375 A.2d 1232 (N.J. Ct. App. 1977)).[4]

---

[4] While analyzing the income loss benefits provision of its state's no-fault act, the New Jersey court explained in *Zyck*: "The law of damages draws a crucial distinction between a business enterprise generating profits primarily from the personal endeavors, skill and attention of the owner and a business enterprise generating profits from the investment of capital or from the labor of others." 364 A.2d at 36 (citations omitted). The court concluded that the claimant was entitled to benefits under this provision based on the profit generated from his real estate practice, reasoning:

> Plaintiff's proofs show that he was the main contributor to Diamond Realty. He alone met with the clients, negotiated contracts and attended title closings. Contacts made by him with farmers through his feed sales provided opportunities to advance his real estate business. On occasion other salesmen were utilized, but their commissions offset any real profit to the business. Plaintiff's wife held the broker's license but she contributed little else to the business.

(Cont'd)

The Michigan Court of Appeals relied on the same material from the uniform act in another lawsuit brought under section 500.3107 of Michigan's No-Fault Act when rejecting the argument made by the personal representative of an insured's estate that "[the insured] was self-employed as an investor of his own funds and, therefore, was entitled to 'work loss' benefits for substituted services which [the representative] and others provided to maintain that investment income." *Freeman v. Colonial Penn Ins. Co.*, 361 N.W.2d 356, 357 (Mich. Ct. App. 1984).

The Michigan Court of Appeals' decisions in *Coates* and *Freeman* lead this Court to conclude that Mr. Milan's alleged loss from the Solaris project is not recoverable as "work loss" under section 500.3107.  The more than $3 million Mr. Milan claims constitutes a return on the investment of capital, rather than income generated from Mr. Milan's personal efforts in self-employment or otherwise.  The evidence reflects that Mr. Milan's primary anticipated contribution to the project was his financial investment, not his personal involvement, skills, attention, or efforts.

---

> Overhead consisted of a small office and its furnishings. The business generated only modest profits and when plaintiff was incapacitated no sales were made. This court is satisfied that plaintiff was responsible for 98.5% of all profit generated by this business, and that his personal endeavors, skill and attention predominated to the exclusion of any return on capital or the labor of others.

*Id*.

Without doubt, Plaintiffs' evidence (including the documents they submitted after the motion hearing) establishes that Mr. Milan has extensive experience as a real estate developer.  As Mr. Milan attests in his affidavit, during his last thirty five years as a real estate developer, he has been "actively and personally involved in all aspects of the development" of his projects and has "perform[ed] functions far different than that of a real estate investor."  (ECF No. 33, Ex. 5 ¶¶ 2, 4; *see also* ECF No. 37, Exs. 5, 10.)  This does not demonstrate that he was so involved with the Solaris project, however.

In fact, the evidence submitted by Plaintiffs-- initially and in their post-hearing supplemental filing-- instead reflects that Mr. Milan, at most, intended to travel to Dallas to "supervise" someone else's execution of the rehab of the project or "personally watch as the project [was] physically completed."  (*See, e.g.*, ECF No. 33, Ex. 5 ¶¶ 6, 12.)  Stated differently, he planned to invest $1 million in the Solaris project, but only if he could keep an eye on his investment.[5]  Mr. Milan

---

[5] Plaintiffs' supplemental materials in fact leave the Court more convinced than it was before the motion hearing that Mr. Milan was only an investor in the Solaris project.  For example, an email exchange between Mr. Milan and Ari on January 20, 2011 reflects only Mr. Milan's concern with the return on his investment, Ari's role as the actual developer, and how Mr. Milan's investment would be used by Ari.  (ECF No. 37, Ex. 13B.)  Nowhere in the email exchange is it suggested that Mr. Milan would play a role in the actual development of the project.  (*Id.*)  When Plaintiffs' counsel asked the Court for the opportunity to submit supplemental evidence, he assured the Court that these additional materials would demonstrate Mr. Milan's direct involvement in the development of the Solaris project during its
(Cont'd)

may have used his experience and skills to analyze whether it was "a good project to add to [his] portfolio" and to give Ari his "opinion and analysis if the project was viable." (*Id*. ¶¶ 7, 9). Yet the Court expects that this is how most investors operate in deciding where to put their money. As such, these statements only further support this Court's conclusion that the income at issue is investment income that the Michigan courts have held is not recoverable as lost income under the No-Fault Act. This holding is further supported by the terms of the unsigned Memorandum of Agreement.

As set forth earlier, the agreement provided for Ari to serve as the asset manager and to contract for an improvement program for the project in exchange for a 1% asset management fee and a 14% fee for the contracted improvements. (ECF No. 31 Ex. 4.) It reflects Mr. Milan's and Martin Nessel's involvement as equal investors, only, promised "a 12% preferred return on their *invested capital*." (*Id*., emphasis added.) Mr. Milan attests that "[i]t also was agreed that [he] would . . . supervise the execution of the rehab of the project." (*Id*., Ex. 5 ¶ 12.) He explains that this was not part of the agreement, however, because "the only person that it pertained to was Martin Nessel . . .." (*Id*.) Mr. Milan's explanation

---

early stages. For example, counsel represented that Mr. Milan was involved in selecting appliances and other materials for the renovation of the first twenty units. This is not reflected in any of the supplemental materials, however. (*See* ECF No. 37.)

begs the question of why this purported part of the agreement would pertain only

to Martin Nessel and not Ari, who was the contemplated developer. It seems that it

would not pertain to Ari only if Mr. Milan's intended role involved something

different than hands-on participation in the development.

The only materials supporting Plaintiffs' claim that Mr. Milan was going to

play more than the role of an investor in the Solaris project are Mr. Milan's

affidavits and his self-serving, unsworn, personally created documents submitted

as part of Plaintiffs' supplemental exhibits. Mr. Milan's statements concerning his

intentions are insufficient on their own to raise a genuine issue of material fact

with respect to whether this loss constitutes work loss under the statute. *See*

*Frazier v. Allstate Ins. Co.*, 585 N.W.2d 365, 367 (Mich. Ct. App. 1998) (citing

*Clute v. Gen. Accident Assurance Co. of Canada*, 446 N.W.2d 839, 844 (Mich. Ct.

App. 1989). In *Clute*, the court concluded that "a bare assertion of intent to secure

employment without any corroboration of such intent or actions taken to obtain

employment during the period of unemployment is insufficient to render an injured

party 'temporarily unemployed.'" 446 N.W.2d at 844. The court reasoned:

> Were we to hold otherwise, the floodgates of liability for work-loss
> benefits would be thrown wide open. Unemployed insureds, although
> having no real intention of seeking employment, could collect work-
> loss benefits upon their own after-the-fact, self-serving statements of
> intention.

*Id.* Although the Michigan Court of Appeals was addressing a somewhat different issue with respect to work loss benefits, this Court finds the rationale applicable to evaluating Mr. Milan's intended role in the Solaris project.

Finally, the legislature's purpose in enacting the work loss benefits provision, as identified by the Michigan Supreme Court in *Perez*, does not support a finding that the claimed loss is covered by the statute.

In short, this Court concludes that the loss claimed by Plaintiffs with respect to the Solaris project constitutes investment income, only, that is not recoverable as work loss under section 500.3107(b).

Accordingly,

**IT IS ORDERED**, that Defendant Pacific Indemnity Company's motion for partial summary judgment is **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: June 11, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, June 11, 2015, by electronic and/or U.S. First Class mail.

s/ Richard Loury
Case Manager

20